UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL WEST, ROMAINE CLARKE, RYON MORGAN, and SAADALA ABOULESSAN, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

LASERSHIP, INC. et al.,

Defendants.

CIVIL ACTION NO. 21 Civ. 5382 (LTS) (SLC)

**OPINION & ORDER**

**SARAH L. CAVE,** United States Magistrate Judge.

## I. INTRODUCTION

Plaintiffs Daniel West ("West") and Romaine Clarke ("Clarke," with West, "Plaintiffs"),[1] filed this putative class and collective action seeking to recover unpaid overtime and related relief under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"), and the New York Labor Law, §§ 190 et seq. ("NYLL"), against Defendants LaserShip, Inc. ("LaserShip"); So Sure Transports, Inc. ("So Sure"); Richard Grace and Richard LLC ("RGR"); and unnamed entities. (ECF No. 22 (the "FAC")).[2] Following limited discovery (see ECF No. 76), Plaintiffs moved for conditional certification of a collective action and related relief under 29 U.S.C. § 216(b) (ECF No. 101 (the "First Collective Motion")), which the Court granted in part and denied in part, denying without prejudice Plaintiffs' request for conditional certification and court-authorized notice but

---

[1] This Opinion and Order does not address the claims of Plaintiffs Ryon Morgan and Saadala Aboulessan, which have been stayed pending arbitration, (ECF No. 59 at 5), and does not address the claims of Plaintiff Alfredo Lara, which were dismissed without prejudice to his right to assert them in arbitration. (ECF No. 156). The Court therefore does not consider their allegations in its analysis below.

[2] Plaintiffs dismissed without prejudice their claims against Defendant Steven Trucking, Inc., (ECF No. 82), and the Clerk of the Court has entered a Certificate of Default as to So Sure and RGR (ECF No. 79), leaving LaserShip as the only appearing Defendant.

directing LaserShip to produce Contact Information for certain drivers.  (ECF No. 119).  See West v. LaserShip, Inc., No. 21 Civ. 5382 (LTS) (SLC), 2024 WL 1461403 (S.D.N.Y. Apr. 4, 2024) ("West I").[3]

Following additional discovery (see ECF Nos. 126; 131; 132; 151; 152; 153; 155), Plaintiffs renew their request for conditional certification of a collective action.  (ECF Nos. 147 (the "Second Collective Motion"); 147-1–147-20), which LaserShip opposes (ECF Nos. 162; 162-1–162-22).  For the reasons set forth below, the Second Collective Motion is GRANTED IN PART and DENIED IN PART.

## II. BACKGROUND[4]

### A. Factual Background[5]

The factual background concerning LaserShip's operations and the employment of Clarke and West is set forth in West I and incorporated by reference.  See West I, 2024 WL 1461403, at *1–4.[6]  We set forth only the additional factual background pertinent to the Second Collective Motion.

---

[3] Unless otherwise stated, all capitalized terms not defined herein shall have the meanings adopted in West I, 2024 WL 1461403 (S.D.N.Y. Apr. 4, 2024).  (ECF No. 119).

[4] In deciding the Second Collective Motion, the Court has considered:  (1) the FAC (ECF No. 22); (2) the Declaration of Jason J. Rozger and exhibits thereto (ECF Nos. 147-1–147-20); (3) Plaintiffs' Memorandum of Law (ECF No. 148); (4) LaserShip's Memorandum of Law and exhibits thereto (ECF Nos. 162; 162-1–162-22); (5) Plaintiffs' reply (ECF No. 165 (the "Reply")); (6) the Declaration of Jason J. Rozger in further support of the Second Collective Motion and exhibits thereto (ECF Nos. 166; 166-1–166-4); and (7) LaserShip's Notice of Supplemental Authority (ECF No. 179).

[5] LaserShip has disputed Plaintiffs' claims and denied any liability.  (See ECF Nos. 73; 106; 162).  Accordingly, this Factual Background does not represent findings of fact for purposes of any future proceeding.

[6] Internal citations and quotation marks are omitted from case citations unless otherwise indicated.

### 1. Plaintiffs' Employment

#### a. Jennifer Cortes[7]

From 2020 until 2023 Jennifer Cortes ("Cortes") delivered packages out of LaserShip's Maspeth warehouse in Queens. (ECF Nos. 147-6 ¶¶ 1–2; 162-12 at 10:6–7). From August 2020 to December 2020, she worked as a driver's helper with her mother, who reported to and whom their supervisor, "Felix," paid by direct deposit. (ECF No. 162-12 at 8:2–7, 13:14–20, 18:2–12). "Some weeks," but "[n]ot all[,]" Cortes worked more than 40 hours per week. (Id. at 29:11–13). Approximately 30 other drivers reported to Felix. (Id. at 13:21–14:2). During the four months she reported to Felix, Cortes did not receive a Form 1099 or payment directly from LaserShip and she and her mother split the amount Felix paid her mother, around $1,200 to $1,600 weekly, in cash. (Id. at 18:2–21, 19:17–20, 31:9–24, 34:24–35:5). Felix told Cortes that LaserShip took a deduction out of each week's pay as a "standing fee" for using the "Elli app." (Id. at 32:15–25; see ECF No. 147-6 ¶ 7).[8] LaserShip also deducted from Cortes' pay an unspecified amount for uniforms. (ECF No. 147-6 ¶ 7).

---

[7] There are inconsistencies between Cortes' declaration and her deposition testimony. (ECF Nos. 147-6; 162-12). For example, in her declaration, Cortes attested that her "pay came directly from Laser[S]hip[,]" but at her deposition, she acknowledged that she never received a direct payment from LaserShip. (Compare ECF No. 147-6 ¶ 2, with ECF No. 162-12 at 20:25–21:2). In addition, in her declaration, she attested that she sorted packages "[a]t the start of each workday," but at her deposition, testified that she did not sort every day but rather only "once or twice a week . . . because the company was having problems with their sorters." (Compare ECF No. 147-6 ¶ 4, with ECF No. 162-12 at 23:22–25). Although the Court, at the collective certification stage, properly avoids evaluating the Plaintiffs' credibility, where there are inconsistencies, the Court credits her deposition testimony, which she testified was "accurate," over her declaration. (ECF No. 162-12 at 40:8–11). See Adam v. Bloomberg L.P., No. 21 Civ. 4775 (JLR) (JLC), 2023 WL 3814252, at *2 (S.D.N.Y. June 5, 2023) ("In determining whether potential opt-in plaintiffs are similarly situated, courts should not weigh the merits of the underlying claims, attempt to resolve factual disputes, or evaluate credibility.")

[8] As noted in West I, LaserShip developed the "Elli" application "for Delivery Service Providers and subcontractors to track package loading and provide proof of delivery[.]" West I, 2024 WL 1461403, at *2.

In December 2020, Cortes began working as a driver's helper with LaserShip's Master Contractor,[9] Right on Time, which had about 20 drivers. (Id. at 22:9–24, 34:8–13). After about a year, she became a driver for Right on Time, making $1,000 to $1,300 weekly, and was paid by direct deposit to her bank account or in cash by "Robin." (Id. at 36:10–23; see, e.g., ECF No. 162-13 at 3, 5, 10, 15, 18, 24 (direct deposits from Right on Time)). She typically worked from around 5:00 a.m. until 9:00 p.m., but "probably two days" a week would work past 9:00 p.m. (ECF No. 162-12 at 30:6–13, 39:11–22). She texted Robin daily with the date and number of packages delivered, for purposes of calculating her pay, but she does not have any of these messages. (Id. at 30:12–25). If she or any of the other drivers arrived late, Robin would deduct $50 from their paychecks as a penalty. (Id. at 26:14–23).

For both Felix and Right on Time, Cortes was paid a per package rate of $1.75 for morning deliveries and $2.75 for afternoon and evening deliveries. (ECF No. 162-12 at 12:10–14, 17:6–10). Although she typically worked more than 40 hours per week during her time as a driver, Cortes was not paid any overtime. (ECF No. 147-6 ¶ 6). Cortes did not receive from LaserShip a Form 1099—the Form 1099 she did receive was from Right on Time—or any direct payment of wages. (ECF No. 162-12 at 19:17–21:3).

**b.  Anyis Cuevas**[10]

From November 7, 2020 until March 2023, Anyis Cuevas ("Cuevas") delivered packages out of LaserShip's Maspeth warehouse at the direction of Master Contractor Macrive Delivery

---

[9] Master Contractors are one of three categories of Delivery Service Providers with whom LaserShip contracts to provide delivery services. See West I, 2024 WL 1461403, at *2.

[10] As with Cortes, there are inconsistencies between Cuevas' declaration and her deposition testimony. (Compare, e.g., ECF No. 147-7 ¶ 2 ("[M]y pay came directly from LaserShip"), with ECF No. 162-8 at 23:11–13 (agreeing that LaserShip "never directly paid" her). Because Cuevas conceded

("Macrive"), which is owned by Johnathan Macias ("Macias").  (ECF Nos. 147-7 ¶¶ 1–2; 162-8 at

8:9–9:8, 11:10–12, 13:2–4, 19:8–12).  Macias was her supervisor and informed her by phone or

text about her daily route, hours, and pay.  (ECF Nos. 162-8 at 12:11–25, 13:18–22, 15:22–23;

162-21 at 3, 5).  She does not have any of the texts with Macias.  (ECF No. 162-8 at 20:17–24).

While making deliveries, Cuevas had to wear a red polo shirt with the LaserShip logo on the front

and Macrive on the back, which she saw other drivers wearing.  (Id. at 27:5–23).

Cuevas typically worked from 6:00 a.m. until 9:00 p.m. or 10:00 p.m. six days per week

initially and then switched to four days a week.  (ECF Nos. 147-7 ¶ 3; 162-8 at 29:8–12).  During

the holidays, she worked later than 10 p.m.  (ECF Nos. 147-7 ¶ 3).  She removed packages from

the conveyor belt in the LaserShip warehouse "maybe once in three years[.]"  (ECF No. 162-8 at

29:25–30:9).

Cuevas was initially paid $1.30 per package in the morning and $2.00 per package in the

afternoon, but the morning rate was lowered to $1.25 per package, resulting in a weekly pay

before deductions of typically between $700 to $900, although her bank records show several

weeks where she was paid above $1,000.  (ECF Nos. 147-7 ¶ 6; 162-8 at 10:9–11:9; 162-9 at 19,

27, 44, 46, 47, 63, 89, 96, 109–11, 116, 117, 119, 125–27, 133–34, 141, 143–44, 160, 186,

193, 207–08, 214, 216, 222, 223, 224, 230–31).  No one from LaserShip informed her what her

per-package compensation would be and Macrive, not LaserShip, paid her wages by check, Zelle,

or cash.  (ECF Nos. 162-8 at 11:2–9, 19:16–19, 21:23–22:14, 23:3–13; see 162-9).  Cuevas received

from Macrive "delivery settlement statements," which showed her location, per package rate,

---

that her deposition testimony was more accurate, the Court credits it to the extent it is inconsistent with
her declaration.  (ECF No. 162-8 at 29:6–12).

number of packages delivered, and pay.  (ECF No. 162-10).  Cuevas was not paid overtime for the hours she worked over 40 hours per week and her pay did not fluctuate with the number of hours she worked.  (ECF Nos. 147-7 ¶ 6; 162-21 at 4).

### c.  Courtney Vickers[11]

From April 2021 to June 2021, Courtney Vickers ("Vickers") delivered packages out of LaserShip's Mineola warehouse at the direction of Master Contractor Araby Delivery Services ("Araby") (owned by Noufou Sawadogo ("Sawadogo")), and from June 2021 until 2023, out of the Maspeth warehouse for Motivation Logistics ("Motivation") (owned by Garth Barnes). (ECF Nos. 147-12 ¶¶ 1–2; 162-11 at 10:7–11:25, 19:8–22:22, 23:5–11).  While Vickers was with Motivation, he began delivering packages at the direction of Shamar O'Connor[12] ("Shamar") of Shamar Delivery Services Inc. ("Shamar Delivery").  (ECF Nos. 162-11 at 6:11–23, 7:6–21; 162-20 at 3–5; 162-22).

Vickers typically worked from 8:30 a.m. until 8:30 p.m., from five to seven days per week. (ECF Nos. 147-12 ¶ 3; 162-11 at 28:6–14).  He would periodically take off several days to drive to Florida or Pennsylvania.  (ECF No. 162-11 at 32:3–33:23).  His supervisors were Sawadogo, Shamar, and "Chris."  (ECF No. 162-2 at 4–5).  While making deliveries from the Maspeth warehouse, Vickers did not physically remove packages from the conveyor belt; rather, his

---

[11] To the extent that Vickers' declaration is inconsistent with his deposition testimony (compare, e.g., ECF No. 147-12 ¶¶ 4–5 with ECF No. 162-11 at 25:18–24), the Court credits his deposition testimony.

[12] Vickers references Shamar's last name as "Concord" in his interrogatory responses, but "O'Connor" in his deposition testimony.  (Compare ECF Nos. 162-20 at 4–5, with 162-11 at 6:12–24).  The Court credits Vicker's deposition testimony, which is consistent with the checks to Vickers from Shamar Delivery Services Inc., which are signed by "Shamar O'Connor."  (ECF No. 162-22 at 2–5).

packages for the day's deliveries were set out on a pallet when he arrived in the morning. (ECF No. 162-11 at 25:18–24).

The Master Contractors—Araby, Motivation, or Shamar Delivery—paid Vickers directly by check, cash, or Zelle.  (ECF Nos. 162-11 at 14:21–15:2, 16:4–12, 28:8–14, 43:2–8; see 162-22).  He had copies of checks from Shamar Delivery Services Inc., but none from Motivation Logistics. (ECF No. 162-11 at 40:2–42:7).  Vickers was paid $1.75 per package for morning deliveries and $2.00 per package for evening deliveries, rates that the Master Contractors set and communicated to him.  (Id. at 8:17–9:4, 12:9–14, 18:5–11).  His pay varied but was as high as $1,500.00 per week.  (ECF Nos. 147-12 ¶ 6; 162-11 at 39:2–4).  Other drivers were also paid per package but at different rates.  (ECF No. 162-11 at 17:18–23, 27:15–22).  Vickers was not paid overtime for the hours he worked over 40 hours per week and his pay did not fluctuate according to the number of hours he worked (although it did vary based on the number of packages he delivered).  (ECF Nos. 147-12 ¶ 6; 162-11 at 37:21–23, 39:14–16).

### d.  Domenica Nastasi[13]

From April 2020 until July 2020, Domenica Nastasi delivered packages out of LaserShip's Maspeth warehouse first for Samir Gonzalez ("Gonzalez"), and then from July 2020 to May 2021, for Master Contractors Remexx LLC ("Remexx") and A&J Five Star Logistics Corp. ("Five Star") (owned by Mike Amador).  (ECF Nos. 147-10 ¶¶ 1–2; 162-14 at 14:9–14, 19:19–22, 20:21–24).

Nastasi typically worked seven days per week for Gonzalez, without a day off, and six days per week for Five Star.  (ECF Nos. 147-10 ¶ 3; 162-14 at 14:9–15:4).  Gonzalez set Nastasi's

---

[13] To the extent Nastasi's declaration is inconsistent with her deposition testimony, (compare, e.g., ECF No. 147-10 ¶ 2 ("my pay came directly from Laser[S]hip"), with ECF No. 162-14 at 25:18–20 (Nastasi "never received any compensation from Laser[S]hip")), the Court credits her deposition testimony.

schedule.  (ECF No. 162-14 at 19:7–9).  Nastasi testified that her co-driver, Keyla, would have records of the hours they worked and number of packages they delivered, but Nastasi did not request copies of these records from Keyla.  (Id. at 16:11–17:9; ECF No. 162-16 at 7:8–13).  For Remexx and Five Star, Nastasi typically worked from 6:00 a.m. until 11:00 a.m., and then from 1:30 p.m. until 9:00 p.m.  (ECF No. 162-14 at 23:5–9).

The Master Contractors—Remexx or Five Star—paid Nastasi (or Keyla, who would then split the pay with Nastasi) directly by check, cash, or Zelle.  (ECF No. 162-14 at 9:8–14, 11:4–11, 12:2–6, 21:20–21).  The Master Contractors set Nastasi's rate per package, $1.25 for the morning packages and $3.00 for the evening packages (later reduced to $2.75).  (Id. at 18:10–22, 19:1–9).  Five Star's name appeared on her paychecks and Form 1099.  (ECF Nos. 162-14 at 22:5–9, 23:23–24:1, 25:21–24; 162-15).  She did not receive any wages or a Form 1099 from LaserShip.  (ECF No. 162-14 at 25:5–20).  Her weekly wages, before deductions, were between $400 and $1,200.  (ECF No. 147-10 ¶ 6).  Nastasi was not paid overtime for the hours she worked over 40 hours per week and her pay did not vary based on the number of hours she worked.  (Id. at ¶ 6).

### e.  James Martinosky[14]

From April 2023 to January 2024, James Martinosky ("Martinosky") delivered packages out of LaserShip's Mineola warehouse for Master Contractor Good to Go Delivery LLC ("Good to Go"), owned by Robert Hickling ("Hickling").  (ECF Nos. 147-11 ¶¶ 1–2; 162-17 at 8:24–9:3, 10:16–11:2, 12:19–13:21).  He was hired and supervised by Chandana Punchibandage ("Chan"),

---

[14] To the extent that Martinosky's declaration is inconsistent with his deposition testimony, (compare, e.g., ECF No. 147-11 ¶ 4 ("At the start of each workday, I would work for about 3 hours in the Laser[S]hip warehouse, sorting packages on the conveyor belt."), with ECF No. 162-17 at 34:17–25 (Martinosky testifying that that statement was "not accurate")), the Court credits his deposition testimony.

who worked under Hickling.  (ECF No. 162-17 at 14:11–14, 36:13–20).  For the last week of January 2024, he provided services to Chan's company, Chan Logistics, Inc. ("Chan Logistics"). (Id. at 32:2–22).

Martinosky was required to deliver packages six days per week on a schedule that Chan set for him as well as other drivers, usually starting between 7:30 a.m. and 9:30 a.m. (ECF No. 162-17 at 20:12–20, 28:20–29:25, 30:8–10).  Martinosky typically worked "at least a ten-hour workday."  (Id. at 34:4–9).  Chan instructed Martinosky about how to organize his packages for delivery using the Elli app.  (Id. at 23:25–25:2).  The packages were already sorted for Martinosky before he arrived at the warehouse, and no one from LaserShip told him to participate in sorting packages.  (Id. at 21:25–22:3, 34:17–25).  Martinosky also occasionally communicated with Hickling about delivery issues, and Hickling assigned Martinosky's daily delivery route.  (ECF Nos. 147-11 ¶ 10; 162-17 at 27:21–24).

The Master Contractors—Good to Go or Chan Logistics—paid Martinosky his weekly wages by check.  (ECF Nos. 162-17 at 15:8–9, 18:2–5, 36:4–15; see 162-18).  He did not receive a paycheck or Form 1099 from LaserShip.  (ECF No. 162-17 at 32:9–12, 33:5–8).  He, like other drivers, was paid per package and earned at times over $1,200 per week, even during the non-holiday season.  (ECF Nos. 147-11 ¶ 6; 162-17 at 15:10–14, 16:24–17:25, 38:13–39:21). Martinosky was not paid overtime for the hours he worked over 40 hours per week. (ECF No. 147-11 ¶ 7).

B. **Procedural Background**

    1. **This Action**

We incorporate by reference the procedural background set forth in West I, see 2024 WL 1461403, at *4, and set forth only the procedural events pertinent to the Second Collective Motion.

In the First Collective Motion, Plaintiffs sought certification of a collective "comprised of all subcontractor delivery drivers at all nine of LaserShip's New York locations from June 17, 2018 to the present (the 'Proposed Collective')." West I, 2024 WL 1461403, at *4. In West I, applying the Second Circuit's "modest plus" standard, see Korenblum v. Citigroup, Inc., 195 F. Supp. 3d 475, 482 (S.D.N.Y. 2016), the Court found that Plaintiffs failed to show "that they are similarly situated to other members of the Proposed Collective, and therefore ha[d] not met their burden to show that conditional certification [was] warranted at [that] time." 2024 WL 1461403, at *7. Although the absences of affidavits from Plaintiffs did "not itself warrant denial of the [First Collective] Motion," the Court found that Plaintiffs' deposition testimony and other evidence failed to "adequately establish[] that they were similarly situated to other members of the Proposed Collective[,]" despite having had nine months of discovery. Id. Neither West nor Clarke communicated or interacted with other drivers and did not know what they were paid, the hours they worked, or their labeling as contractors or employees. Id. Further, neither "named even a single other employee at the facilities where they worked who [was] similarly deprived of overtime under the FLSA." Id.

Considering, however, "the remedial purpose of the FLSA and the Court's broad discretionary power," the Court granted Plaintiffs' request to compel LaserShip to produce the

Contact Information, i.e., names, last known addresses, telephone numbers, and email addresses for subcontractor drivers who worked at the Maspeth, Mineola, and Port Chester facilities from June 17, 2018 to the present. West I, 2024 WL 1461403, at *8. The Honorable Laura Taylor Swain denied LaserShip's request for a stay of discovery and overruled its objections to West I. (ECF No. 129).

On May 28 and May 30, 2024, LaserShip produced the Contact Information, following which Plaintiffs' counsel sent emails to over 4,400 drivers inviting them to participate in this action. (ECF Nos. 131 at 1; 162-3 ¶ 5; 162-7). Following a conference with the parties, on June 25, 2024, the Court entered an amended case management plan directing limited discovery (the "Phase II Discovery"), setting a deadline of September 23, 2024 for Plaintiffs to identify any additional drivers or plaintiffs who intend to join the action, and setting a briefing schedule for the Second Collective Motion. (ECF No. 132 (the "FACMP")). On September 30, 2024 and October 4, 2024, eight additional drivers consented to be plaintiffs in this action (the "Opt-In Plaintiffs"). (ECF Nos. 135–42).[15]

On October 25, 2024, Plaintiffs filed the Second Collective Motion, in which they ask the Court to: (i) certify the same Proposed Collective as in the First Collective Motion; (ii) approve a revised notice to the Proposed Collective (the "Revised Notice"); (iii) require LaserShip to disclose the Contact Information, to the extent not already produced; (iv) permit Plaintiffs to post the Revised Notice in common areas at all of LaserShip's New York locations; and (v) equitably toll

---

[15] The Opt-In Plaintiffs are: Jennifer Cortes; Courtney Vickers; Dalton Gordon ("Gordon"); Domenica Nastasi; James Martinosky; Saba Topuria ("Topuria"); Tony Garcia ("Garcia"); and Alfredo Lara. (ECF Nos. 135–42). As noted above, Alfredo Lara's claims have been dismissed without prejudice. (See n.1, supra).

the statute of limitations from September 17, 2021.  (ECF Nos. 147; 147-17 at 2–4; 147-20).  In support of the Second Collective Motion, Plaintiffs submitted: (i) excerpts and the deposition notice from LaserShip's Federal Rule of Civil Procedure 30(b)(6) deposition, and excerpts from Clarke's and West' depositions; (ii) West's bank statements; (iii) declarations from the Opt-In Plaintiffs and Esteven Velez ("Velez") (the "Opt-In Declarations"); and (iv) the Proposed Notice and proposed email and text messages to the Proposed Collective.  (ECF Nos. 147-1–147-20). Plaintiffs subsequently withdrew the declarations of Topuria (ECF No. 147-8), Garcia (ECF No. 147-9), Velez (ECF No. 147-13), and Gordon (ECF No. 147-14) due to their failure to communicate with Plaintiffs' counsel.  (ECF No. 159; see ECF No. 157 at 3–5).

The Court extended the Opt-In Plaintiffs' document production deadline to January 31, 2025, then to February 28, 2025, and finally to March 10, 2025 (for Cuevas and Garcia), and granted the parties' request to extend the briefing schedule for the Second Collective Motion.  (ECF Nos. 152–53; 155).  The Court also held several conferences with the parties regarding discovery and the Second Collective Motion.  (ECF Nos. 127; 133; 153; 157; 169; 171; 174; ECF min. entries dated June 25, 2024, Feb. 3, 2025, Mar. 4, 2025, May 29, 2025, June 30, 2025).

On April 14, 2025, LaserShip submitted its memorandum of law in opposition to the Second Collective Motion (ECF No. 162 (the "Opposition")), along with declarations, deposition excerpts, and exhibits.  (ECF Nos. 162-1–162-22).  On May 7, 2025, Plaintiffs filed a reply memorandum of law (ECF No. 165 (the "Reply")), along with additional deposition excerpts and exhibits.  (ECF Nos. 166–166-4).  On May 14, 2025, LaserShip requested oral argument on the

Second Collective Motion. (ECF No. 167). On August 6, 2025, LaserShip submitted supplemental authority in further support of its Opposition. (ECF No. 179–179-1).

### 2. The Hunter Action

On December 23, 2024, two delivery drivers who worked for Master Contractors at three of LaserShip's Virginia warehouses and one Maryland warehouse (the "Hunter Plaintiffs") filed in the United States District Court for the Eastern District of Virginia an action under the FLSA alleging, as in this action, that LaserShip misclassified them as independent contractors and failed to pay them overtime wages (the "Hunter Action"). (ECF No. 168-1 (Memorandum Opinion and Order dated May 14, 2025, Hunter v. LaserShip, Inc., No. 24 Civ. 2345 (AJT) (IDD)). See Hunter v. LaserShip, Inc., No. 24 Civ. 2345 (AJT) (IDD), 2025 WL 1399195, at *1 (E.D. Va. May 14, 2025) ("Hunter I").[16]

On May 14, 2025, the Honorable Anthony J. Trenga granted the Hunter Plaintiffs' motion for FLSA collective certification and certified a collective consisting of: "All delivery drivers nationwide who provided deliveries for [LaserShip[17]] through one or more of its Master Contractors at any time since December 23, 2021, and did not sign an agreement to arbitrate and/or a class waiver with [LaserShip]" (the "Hunter Collective"). Hunter I, 2025 WL 1399195, at *7. Judge Trenga found, based on the Hunter Plaintiffs' declarations and the Opt-In Declarations in this action that the Hunter Plaintiffs "made the modest factual showing required at this stage to authorize notice to an identified class of similarly situated persons." Id. at *4. He noted that

---

[16] The Hunter Plaintiffs also asserted wage and hour claims under Virginia law. Hunter I, 2025 WL 1399195, at *1 n.1.

[17] In the Hunter Action, LaserShip is named as "LaserShip, Inc. (d/b/a OnTrac Final Mile)." Hunter I, 2025 WL 1399195, at *1. For consistency, we continue to refer to LaserShip, rather than OnTrac.

both sets of declarations affirmed that the Hunter Plaintiffs "worked for three Master Contractors and out of four [LaserShip] warehouses in two states, . . . did not receive overtime pay, . . . and based on their interactions with hundreds of other delivery drivers, know that other delivery drivers who work for different Master Contractors are subject to similar work requirements and compensation." Id.

Judge Trenga ordered, inter alia, the Hunter Plaintiffs to send to the Hunter Collective notice of the Hunter Action, set an opt-in deadline of 90-days from the issuance of that notice, and ordered LaserShip to provide contact information for members of the Hunter Collective. Id. at *7–8. The docket for the Hunter Action reflects over 360 opt-in plaintiffs. (See generally Hunter v. LaserShip, Inc., No. 24 Civ. 2345 (AJT) (IDD) (E.D. Va.)).

LaserShip sought certification of Hunter I for an interlocutory appeal, which Judge Trenga denied on June 24, 2025. (ECF Nos. 44 & 65, Hunter v. LaserShip, Inc., No. 24 Civ. 2345 (AJT) (IDD) (E.D. Va.)). See Hunter v. LaserShip, Inc., No. 23 Civ. 2345 (AJT) (IDD), 2025 WL 1774661 (E.D. Va. June 24, 2025) ("Hunter II"). In Hunter II, Judge Trenga noted his "intention [] to reconsider whether to include the New York collective action members at the decertification stage, based on whether a collective action has been authorized in West at that time." Id. at *4.

Plaintiffs also moved to intervene and for a preliminary injunction in the Hunter Action, both of which Judge Trenga also denied following a hearing on July 23, 2025. (See ECF Nos. 168 at 2; 177 at 1; ECF No. 87, Hunter v. LaserShip, Inc., No. 24 Civ. 2345 (AJT) (IDD) (E.D. Va.)). In doing so, Judge Trenga noted that if this Court "decides to certify the New York class, that [he]

would take appropriate action to either decertify or transfer that group of plaintiffs to the New York court." (ECF No. 181-1 at 5:4–7; see id. at 8:12–15, 15:10–15).[18]

LaserShip thereafter asserted that supplemental briefing on the Second Collective Motion was "necessary to address (1) how the Hunter Court's ruling should impact this Court's conditional certification order as to individuals who received notice in the Hunter [Action] and (2) how the Court should handle individuals who did not receive notice in the Hunter [Action]." (ECF No. 177 at 1). Plaintiffs opposed LaserShip's request. (Id. at 3–4). The Court informed the parties that it did "not deem further briefing . . . necessary. If the [Second Collective M]otion is granted, the concerns [LaserShip] has raised can be addressed as necessary in the notice to the members of the collective." (ECF No. 178 at 1).

### III. DISCUSSION

#### A. Legal Standard

Section 216(b) of the FLSA provides, in pertinent part:

> An action to recover . . . liability . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). While the FLSA does not prescribe any procedures for approval of actions brought collectively by those who are "similarly situated," courts have long construed Section 216(b) to grant district courts the authority to order that notice be given to potential plaintiffs informing them of the option to join the suit. See Hoffmann-La Roche Inc. v. Sperling,

---

[18] At this Court's request, the parties submitted a copy of the transcript of the July 23, 2025 hearing before Judge Trenga. (ECF Nos. 180–181-1).

493 U.S. 165, 169 (1989) ("[D]istrict courts have discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) . . . by facilitating notice to potential plaintiffs."); Braunstein v. E. Photographic Labs., Inc., 600 F.2d 335, 336 (2d Cir. 1978) (per curiam) ("Although one might read the [FLSA], by deliberate omission, as not providing for notice . . . it makes more sense, in light of the 'opt-in' provision of [Section] 16(b) of the [FLSA], 29 U.S.C. § 216(b), to read the statute as permitting, rather than prohibiting, notice in an appropriate case.")  Although orders authorizing notice are sometimes referred to as orders "certifying" a collective action, the FLSA does not contain a certification mechanism.  See Myers v. Hertz Corp., 624 F.3d 537, 555 n.10 (2d Cir. 2010).  Thus, where a court refers to "certifying" a collective action, it means only that the court has exercised its discretionary power "to facilitate the sending of notice" to similarly situated individuals.  Id. The recognition of a collective action is thus equivalent to a "'case management' tool for district courts to employ in 'appropriate cases.'"  Id. (quoting Hoffmann-La Roche, 493 U.S. at 169).

The Second Circuit has approved a two-step process to evaluate whether to approve a collective action.  Myers, 624 F.3d at 554–55.  First, the court must make "an initial determination" whether to send notice to potential opt-in plaintiffs who may be "similarly situated" to the named plaintiffs as to whether the alleged FLSA violation occurred.  Id. at 555; Damassia v. Duane Reade, Inc., No. 04 Civ. 8819 (GEL), 2006 WL 2853971, at *3 (S.D.N.Y. Oct. 5, 2006).  A plaintiff must make a "modest factual showing" that he and the potential opt-in plaintiffs "together were victims of a common policy or plan that violated the law."  Myers, 624 F.3d at 555 (quoting Hoffman v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997)).  At this first stage, the case has not typically "had the benefit of full discovery," and thus courts consider the pleadings as well as supporting affidavits from the named plaintiff to evaluate whether he has

made the "modest factual showing" that he is similarly situated to potential opt-in plaintiffs vis-à-vis the defendants' allegedly unlawful employment practices.  Korenblum v. Citigroup, Inc., 195 F. Supp. 3d 475, 480 (S.D.N.Y. 2016); see Almonte v. Marina Ice Cream Corp., No. 16 Civ. 660 (GBD), 2016 WL 7217258, at *1 (S.D.N.Y. Dec. 8, 2016).  "For similar reasons, courts do 'not resolve factual disputes, decide ultimate issues on the merits, or make credibility determinations' at the first stage."  Korenblum, 195 F. Supp. 3d at 480 (quoting In re Penthouse Exec. Club Comp. Litig., No. 10 Civ. 1145 (NRB), 2010 WL 4340255, at *2 (S.D.N.Y. Oct. 27, 2010)).

At the second step, on a more complete record following discovery, the district court determines whether a "collective action" may proceed based on the named plaintiff having shown that the plaintiffs who opted in are actually "similarly situated" to him.  Myers, 624 F.3d at 555.  If the court is not convinced, it may "de-certify" the action and dismiss the opt-in plaintiffs' claims without prejudice.  Id.

At the first step, a plaintiff's "burden of proof is low, [but] it is not non-existent—certification is not automatic.'"  Romero v. H.B. Auto. Grp., Inc., No. 11 Civ. 386 (CM), 2012 WL 1514810, at *10 (S.D.N.Y. May 1, 2012); see Guan Ming Lin v. Benihana Nat'l Corp., 755 F. Supp. 2d 504, 509 (S.D.N.Y. 2010) (explaining that "plaintiff's supporting allegations must be specific, not conclusory").  A plaintiff cannot satisfy his burden at the conditional certification stage by "unsupported assertions," Myers, 624 F.3d at 555, or with "conclusory allegation[s.]" Morales v. Plantworks, Inc., No. 05 Civ. 2349 (DC), 2006 WL 278154, at *3 (S.D.N.Y. Feb. 2, 2006). "Evidence is required."  Peralta v. CB Hosp. & Events, LLC, No. 22 Civ. 10805 (GHW) (BCM), 2024 WL 916523, at *4 (S.D.N.Y. Mar. 4, 2024).

Where the parties have completed, or substantially completed, conditional collective certification discovery, courts in this District have applied "'a modest plus'" standard of review to motions under FLSA Section 216(b). Korenblum, 195 F. Supp. 3d at 482 (quoting Creely v. HCR ManorCare, Inc., 789 F. Supp. 2d 819, 826 (N.D. Ohio 2011)); see Brown v. Barnes & Noble, Inc., No. 16 Civ. 7333 (RA), 2019 WL 5188941, at *2 (S.D.N.Y. Oct. 15, 2019) (finding that "modest plus" approach "made eminent sense" where parties had completed six months of discovery "targeted to conditional certification"). In applying the "modest plus" standard of review, courts "look beyond the pleadings and affidavits submitted by Plaintiffs and will consider the evidence submitted by both parties, albeit with an understanding 'that the body of evidence is necessarily incomplete.'" Korenblum, 195 F. Supp. 3d at 482 (quoting Creely, 789 F. Supp. 2d at 826). In reviewing the parties' evidence, "the Court still will not decide the ultimate merits of the case or issues better suited for a decertification motion." Id. Rather, the Court continues to assess whether "'it is more likely that a group of similarly situated individuals may be uncovered by soliciting opt-in plaintiffs'—in other words, that Plaintiffs have, through discovery, 'advanced the ball down the field.'" Id. (quoting Creely, 789 F. Supp. 2d at 827).

Notwithstanding the Second Circuit's precedent and the decision in West I, LaserShip again asks the Court to apply a "heightened" standard adopted by the Fifth and Sixth Circuits, which requires a plaintiff to "prove" that putative opt-in plaintiffs are similarly situated to the named plaintiffs. (ECF No. 162 at 26–27 (citing Swales v. KLLM Transp. Servs., L.L.C., 985 F.3d 430 (5th Cir. 2021) and Clark v. A&L Homecare & Training Ctr., LLC, 68 F.4th 1003 (6th Cir. 2023)). For the same reasons as in West I, see 2024 WL 1461403, at *6, the Court declines LaserShip's request to apply a more "heightened" standard, and instead, because the parties here engaged

in more than a year of discovery, including document production and depositions of both Plaintiffs, five of the Opt-In Plaintiffs, and LaserShip's Rule 30(b)(6) representative (see § II.B, supra), applies the Second Circuit's "modest plus" standard.  See Brown, 2018 WL 3105068, at *18 (applying modest-plus standard to plaintiffs' renewed collective certification motion that followed six months of targeted discovery).

    B.  **Application**

        1.  **The Court will Certify a Narrower Collective**

       Applying the "modest plus" standard, the Court finds that Plaintiffs have shown that they are similarly situated to a group of drivers narrower than the Proposed Collective and therefore have met their "modest plus" burden to show that conditional certification of a more limited collective than the Proposed Collective is warranted.

       As we have explained, "[a]t this stage of the litigation, Plaintiffs need only proffer substantial allegations of a factual nexus between them and potential opt-in plaintiffs with regard to [an] FLSA violation."  West I, 2024 WL 1461403, at *7.  In cases such as this, involving employees from multiple locations, "courts consider whether the plaintiffs have made an adequate factual showing to support an inference that . . . a uniform policy or practice exists, and whether the locations share common ownership or management."  Id.  Here, Plaintiffs argue that they are similarly situated to the Proposed Collective, comprised of drivers at all nine LaserShip warehouses in New York State whom LaserShip has misclassified as independent contractors and deprived of overtime compensation.  (ECF Nos. 147; 147-17 at 1; 147-20 at 2; 148).  Plaintiffs contend that through the declarations of the Plaintiffs, the Opt-In Plaintiffs, and Velez, along with the testimony of LaserShip's Rule 30(b)(6) witness, they have provided "ample evidence that

there are other LaserShip drivers who are similarly situated." (ECF No. 148 at 16–17). LaserShip responds that Plaintiffs have submitted "no evidence" of a common policy or plan that violated the FLSA. (ECF No. 162 at 29–33). LaserShip contends that Plaintiffs have not shown that LaserShip controlled drivers who worked for Delivery Service Providers and thus have not shown that LaserShip had a common policy of misclassifying them as independent contractors, requiring them to work over 40 hours per week, or depriving them of overtime compensation. (Id.)

The Court finds that Plaintiffs have met their modest-plus burden to show that they are similarly situated to other drivers, but only at LaserShip's Maspeth and Mineola warehouses, not the other seven LaserShip warehouses in New York State, as Plaintiffs request in the Proposed Collective. In West I, the Court found that because neither West, who made deliveries out of the Port Chester warehouse, or Clarke, who made deliveries out of the Maspeth and Mineola warehouses, mentioned any conversations with or could even name any other employee at those locations who were similarly deprived of overtime, Plaintiffs failed to "clear[] the 'modest factual showing' required by the Second Circuit." 2024 WL 1461403 at *7. With the additional declarations from Cortes, Cuevas, Vickers, Nastasi, and Martinosky, however, Plaintiffs have remedied that deficiency as to the Maspeth and Mineola locations. Those declarations affirm that these five Opt-In Plaintiffs and Clarke made deliveries for ten Master Contractors out of LaserShip's Maspeth and Mineola warehouses, that they were often required to work over 40 hours per week without overtime pay, and that based on their interactions with dozens of other drivers, know that drivers who work for those and other Master Contractors are subject to similar work requirements and compensation. (See § II.A.1, supra).

For example, Cortes testified that, when she made deliveries for "Felix" out of the Maspeth warehouse, she worked over 40 hours during "[s]ome" weeks without overtime pay and that there were approximately 30 other drivers—including her mother—who reported to him and had the same, or similar, hours and the same per-package compensation. (ECF Nos. 162-12 at 8:4–7, 12:3–23, 13:16–14:1, 17:4–25, 18:2–12, 29:11–13). She also testified that when she made deliveries for Right on Time out of the Maspeth warehouse, she similarly worked some weeks more than 40 hours without overtime pay and that there were approximately 20 other drivers who delivered for Right on Time and had similar hours, and the same per-package compensation and $50 late-arrival penalty. (Id. at 12:3–23, 17:6–10, 22:9–24, 26:14–23, 30:6–13, 34:8–13, 39:15–22). Clarke, Cuevas, Nastasi, and Vickers corroborate Cortes' assertions that drivers who made deliveries out of LaserShip's Maspeth warehouse had similar schedules and per-package compensation but were not paid overtime. (ECF Nos. 106-2 at 17:21–18:4, 25:2–27:25; 147-7 ¶¶ 3, 6; 147-10 ¶¶ 1–3, 6; 147-12 ¶¶ 3, 6; 162-6 at 16:21–23, 18:2–4; 162-8 at 29:8–12; 162-11 at 18:5–11, 12:9–14, 17:18–23, 27:15–22, 28:6–14, 37:21–23, 39:14–16; 162-14 at 14:9–15:4, 16:11–25, 23:5–9; 162-21 at 4). As to LaserShip's Mineola warehouse, Martinosky, Vickers, and Clarke all make similar assertions that they and other drivers worked comparably long hours for which they received per-package wages but not overtime wages. (ECF Nos. 147-11 ¶¶ 1–2, 6–7; 147-12 ¶¶ 1–3; 162-6 at 78:6–19, 80:8–13, 91:17–19; 162-11 at 12:8–24, 18:5–11, 28:6–12; 162-17 at 15:11–14, 17:3–25, 20:12–20, 28:20–29:25, 30:8–10, 38:13–39:21).

Accordingly, Plaintiffs have met their modest-plus burden to show that they and other drivers who made deliveries out of LaserShip's Maspeth and Mineola warehouses worked

comparably long hours without overtime compensation and therefore were similarly situated to warrant distribution of notice of this action under the FLSA.  See Garcia v. Chipotle Mexican Grill, Inc., No. 16 Civ. 601 (ER), 2016 WL 6561302, at *6–7 (S.D.N.Y. Nov. 4, 2016) (authorizing notice to citywide collective where plaintiff described conversations with named co-workers whom defendants subjected to common time-keeping and compensation practices); Fasanelli v. Heartland Brewery, Inc., 516 F. Supp. 2d 317, 322 (S.D.N.Y. 2007) (authorizing notice where plaintiffs' declarations plus 18 opt-in plaintiffs supported finding that employees were similarly subjected to common time-keeping practices that deprived them of wages under FLSA); Chowdhury v. Duane Reade, Inc., No. 06 Civ. 2295 (GEL), 2007 WL 2873929, at *4 (S.D.N.Y. Oct. 2, 2007) (authorizing notice where plaintiffs' and opt-in plaintiffs' affidavits and deposition testimony showed that defendants subjected them to similarly employment and compensation policies).

The Court maintains the conclusion, however, that Plaintiffs still have not shown that they are similarly situated to drivers who made deliveries out of LaserShip's seven other warehouses in New York.  See West I, 2024 WL 1461403, at *7.  First, as to the Port Chester warehouse, Plaintiffs continue to offer nothing beyond West's deposition testimony, which the Court has already found deficient.  See West I, 2024 WL 1461403, at *7.  (See ECF No. 162-3 ¶ 5).[19]  Second, as to the other six New York warehouses, despite having contact information for and sending emails to over 4,400 drivers to solicit their participation in this action, Plaintiffs offer no evidence whatsoever—not even the name of a single driver who made deliveries out of any of these

---

[19] As noted above, the Court does not consider the declaration from Lara, who delivered packages out of the Port Chester location but whose claims were dismissed.  (See n.1, supra; see ECF No. 162 at 16 n.5).

warehouses or any communication between them and any of the Plaintiffs or Opt-In Plaintiffs. The logical inference from the fact that drivers from the other six warehouses have chosen not to participate or provide any information to support Plaintiffs claims is that those drivers are not subject to the same employment terms and compensation as Plaintiffs.  See Johnson-Cradle v. KPS Affiliates Inc., No. 22 Cl. 1052 (PGG) (SLC), 2023 WL 3091675, at *4–5 (S.D.N.Y. Apr. 26, 2023) (limiting collective to Bronx location where plaintiff worked and denying state- or city-wide certification); Hernandez v. NHR Human Resources, LLC, No. 20 Civ. 3019 (PGG), (DF), 2021 WL 2535534, at *11 (S.D.N.Y. June 18, 2021) (limiting conditional certification to employees with same job title as plaintiff in Manhattan, but not other boroughs, where there was "no indication" that they were "subjected to the same allegedly unlawful payment policy or plan"); Contrera v. Langer, 278 F. Supp. 3d 702, 719 (S.D.N.Y. 2017) (limiting collective to superintendents at defendants' buildings in upper Manhattan and the Bronx only); Hamadou v. Hess Corp., 915 F. Supp. 2d 651, 666–667 (S.D.N.Y. 2013) (limiting collective to employees at gas stations in Queens and the Bronx, but not state- or nation-wide); see also Fu v. Mee May Corp., No. 15 Civ. 4549 (KPF), 2016 WL 1588132, at *4 (S.D.N.Y. Apr. 20, 2016) (denying conditional certification where plaintiffs failed to show factual nexus between themselves and collective they sought to represent); Guillen v. Marshalls of MA, Inc., 750 F. Supp. 2d 469, 477 (S.D.N.Y. 2010) (denying conditional certification where plaintiff lacked personal knowledge about employees' compensation at stores other than those at which he worked).  Accordingly, because Plaintiffs have not provided any details about, observations of, or communication with drivers at the Albany, Buffalo, Binghamton, Newburgh, Port Chester, Rochester, and Syracuse warehouses,

Plaintiffs have not shown that drivers from these locations are similarly situated under the FLSA.[20]

LaserShip's contentions that Plaintiffs have failed to show a common plan or policy requiring drivers to work over 40 hours per week without overtime in violation of the FLSA or that LaserShip controlled the drivers' employment terms, as well as arguments about evidentiary issues, (ECF No. 162 at 29–37), are arguments that go to the merits of the Plaintiffs' claims, which the Court may not weigh at this time.  See Hamadou, 915 F. Supp. 2d at 662 ("In ascertaining whether potential opt-in plaintiffs are similarly situated, courts should not weigh the merits of the underlying claims.")  Variations in the number of hours drivers worked (ECF No. 162 at 29–30), are not relevant to the question of whether they were similarly situated because "it is always the case in an FLSA overtime collective action that there will be some variation in the amount of overtime hours worked[,]" and so "[t]o hold that such variation is sufficient to deny conditional certification would be to effectively eliminate collective actions in all overtime suits."  Viriri v. White Plains Hosp. Med. Ctr., 320 F.R.D. 344, 353 (S.D.N.Y. 2017).  Similarly, the per-package rate that drivers received (ECF No. 162 at 30–31), relates to the amount of their damages and does not preclude a finding that they are similarly situated.  See Zeledon v. Dimi Gyro LLC, No. 15 Civ. 7301 (TPG) (DF), 2016 WL 6561404, at *10 (S.D.N.Y. Oct. 13, 2016) (finding that differences in amount and manner of weekly wages were "not a sufficient reason to deny certification" of a collective); Sanchez v. La Cocina Mexicana, Inc., No. 09 Civ. 9072 (SAS), 2010 WL 2653303, at *1 (S.D.N.Y. July 1, 2010) (finding that differences in calculation of damages did not preclude

---

[20] Plaintiffs appropriately refrain from attempting to rely on the declarations of the Hunter plaintiffs, who delivered packages out of warehouses in Virginia and Maryland and therefore do not shed any light on the conditions at the other seven New York warehouses.  See Hunter I, 2025 WL 1399195, at *1.

certification of collective).  Finally, whether there is sufficient evidence to show that LaserShip was Plaintiffs' employer—or joint employer with the Delivery Service Providers (ECF No. 162 at 29, 31–33)—is also a merits issue that is not ripe for consideration at this time.  See Huggins v. Chestnut Holdings Inc., No. 18 Civ. 1037 (PAC), 2020 WL 4016070, at *1 (explaining that defendants' "joint-employer argument was premature on the motion for conditional certification").

Of course, LaserShip's liability is not a foregone conclusion, and LaserShip has pointed out discrepancies between Plaintiffs' and Opt-In Plaintiffs' statements that raise colorable questions about their credibility.  (See nn.7, 10–11, 13–14, supra; see ECF No. 162 at 35–37).  We may not at this time, however, "resolve factual disputes, decide substantive issues going to the merits, or make credibility determinations."  Hamadou, 915 F. Supp. 2d at 662; see Hoffman-LaRoche, 493 U.S. at 174 (explaining that district courts, at collective certification stage, "must take care to avoid even the appearance of judicial endorsement of the merits of the action").  Ultimately, because LaserShip's arguments require a resolution of factual disputes that relate to the merits of Plaintiffs' claims, they fail to preclude collective certification.  See Fasanelli, 516 F. Supp. 2d at 322 (finding that defendants' fact-based challenges were "misplaced" and did not preclude certification of collective).

Accordingly, the Court finds that Plaintiffs have shown that they are similarly situated to drivers who delivered packages out of LaserShip's Maspeth and Mineola warehouses from June 17, 2018 to the present (the "Collective"),[21] but excludes from the Collective drivers from the Albany, Buffalo, Binghamton, Newburgh, Port Chester, Rochester, and Syracuse warehouses.

---

[21] See § III.B.2.b, infra.

See Gorey v. Manheim Servs. Corp., No. 10 Civ. 1132 (JSG), 2010 WL 5866258, at *5 (S.D.N.Y. Nov. 10, 2010) (noting that "it is within the district court's power to limit the scope of the proposed class in a collective action").

### 2. The Notice and Consent Form Must Be Revised

#### a. Content of the Notice

For the reasons set forth above, the Court authorizes notice to be sent only to the Collective, comprised of drivers who delivered packages out of LaserShip's Maspeth and Mineola warehouses from June 17, 2018 to the present. The parties shall meet and confer to revise the Proposed Notice (ECF No. 147-17) to narrow its scope consistent with this Opinion and Order (the "Revised Notice").

#### b. Time Period

"The statute of limitations applicable to a claim for unpaid wages and/or overtime compensation under the FLSA is two years from the date that the claim accrued or three years for a cause of action arising out of a willful violation." Taveras v. D & J Real Estate Management II, LLC, 324 F.R.D. 39, 47 (S.D.N.Y. 2018) (citing 29 U.S.C. § 255(a)). Allegations of willful FLSA violations provide a sufficient basis to apply the three-year statute of limitations at the conditional certification stage. Id.

Plaintiffs' Proposed Collective seeks certification of a three-year period before the filing of this action to present, i.e., from June 17, 2018 to the present. (ECF No. 147-20). Plaintiffs have alleged that LaserShip's FLSA violations were willful (ECF No. 22 ¶ 164), which "is sufficient at the conditional certification stage to apply the three-year limitations period." Johnson-Cradle, 2023 WL 3091675, at *7 (collecting cases permitting three-year notice period).

Accordingly, the Revised Notice shall be sent only to drivers who delivered packages out of LaserShip's Maspeth and Mineola warehouses from June 17, 2018 to the present.

### c.  Distribution Methods

Plaintiffs seek authorization to distribute notice by regular mail, email, and text message and to require LaserShip to post the notice in each of its New York locations.  (ECF Nos. 147; 147-17; 147-18; 147-19).  LaserShip requests either 21 days to meet and confer with Plaintiffs about the distribution methods or permission to file a supplemental brief.  (ECF No. 162 at 37).

The Court has already instructed the parties to meet and confer regarding the content of the Revised Notice, and the method of its distribution is also an appropriate subject for that discussion.  For the reasons set forth above, however, the Court requires that LaserShip post the Revised Notice in its Maspeth and Mineola warehouses, but not the other seven New York warehouses.  (See § III.B.1, supra).  See Johnson-Cradle, 2023 WL 3091675, at *8 (requiring notice to be posted only in single location where plaintiff worked); Hamadou, 915 F. Supp. 2d at 669 (requiring notice to be posted only in locations that were included in collective).  The parties shall also meet and confer regarding the content and distribution of the email and text messages, which courts have deemed an appropriate method.  See, e.g., Carrasquillo v. Westech Sec. & Inv. Inc., No. 23 Civ. 4931 (MKV), 2025 WL 1558201, at *2 (S.D.N.Y. June 2, 2025) (authorizing notice distribution by mail, email, and text message); Curry v. P&G Auditors & Consultants, LLC, No. 20 Civ. 6985 (LTS) (SLC), 2021 WL 2414968, at *13 (S.D.N.Y. June 14, 2021) (same).

### d.  Contact Information

As noted above, LaserShip has already produced the Contact Information.  (See § II.B.1, supra).  Plaintiffs nevertheless ask that LaserShip produce contact information for the Proposed

Collective "to the extent not[]already produced[.]"  (ECF No. 147-20 at 1).  As with the Revised

Notice, the parties shall meet and confer regarding whether LaserShip possesses any additional

Contact Information for the members of the Collective that it has not already produced, and if

so, a deadline for such production no later than 30 days from the date of this Opinion and Order.

See Johnson-Cradle, 2023 WL 3091675, at *8 (noting that production of contact information at

notice stage is appropriate).

### 3.  Equitable Tolling is Not Warranted

Finally, Plaintiffs ask for equitable tolling of the FLSA statute of limitations from

September 17, 2021, the date they filed the First Collective Motion.  (ECF No. 148 at 23–27).

LaserShip opposes equitable tolling.  (ECF No. 162 at 38).

In this Circuit,

> when determining whether equitable tolling is applicable, a district court must
> consider whether the person seeking application of the equitable tolling doctrine
> (1) has acted with reasonable diligence during the time period she seeks to have
> tolled, and (2) has proved that the circumstances are so extraordinary that the
> doctrine should apply.

Zerilli-Edelglass v. New York City Transit Auth., 333 F.3d 74, 80–81 (2d Cir. 2003), as amended (2d

Cir. July 29, 2003).  "Equitable tolling is appropriate only in rare and exceptional circumstances,

where a plaintiff has been prevented in some extraordinary way from exercising his rights."

Garcia, 2016 WL 6561302, at *10.  In the FLSA context, "[a]n extraordinary circumstance might

exist if the employee shows that it would have been impossible for a reasonably prudent person

to learn of the cause of action . . . or if the defendant concealed from the plaintiff the existence

of the cause of action."  Whitehorn v. Wolfgang's Steakhouse, Inc., 767 F. Supp. 2d 445, 449

(S.D.N.Y. 2011).

While Plaintiffs claim that they have acted with diligence and that extraordinary circumstances, including LaserShip's unsuccessful motion to dismiss, delayed sending notice to potential opt-in plaintiffs (ECF No. 148 at 24–25), they fail to show that any opt-in plaintiffs have met the first "diligence prong" of the test in the Second Circuit.  See Knox v. John Varvatos Enters. Inc., 282 F. Supp. 3d 644, 659 (S.D.N.Y. 2017).  What is relevant is not the "diligence of a plaintiff who has already timely filed a claim," but instead the "diligence of a plaintiff who is seeking the application of the doctrine."  Id. at 658.  Plaintiffs have made no showing that any potential opt-in plaintiffs have "acted with reasonable diligence" to pursue their claims as would justify equitable tolling at this time.  Zerilli-Edelglass, 333 F.3d at 81.  Plaintiffs' contention that equitable tolling is necessary "to avoid inequitable circumstances" (ECF No. 148 at 23), appears to rest simply "on the assumption that potential plaintiffs have been, and will remain, unaware of their rights unless and until they receive notice of this lawsuit."  Hintergerger v. Cath. Health Sys., No. 08 Civ. 380, 2009 WL 3464134, at *15 (W.D.N.Y. Oct. 21, 2009).  The fact that Plaintiffs had the opportunity to contact more than 4,400 drivers who delivered packages out of LaserShip's New York warehouses, and only eight additional drivers—the Opt-In Plaintiffs—consented to be plaintiffs, belies any suggestion that potential plaintiffs have been unaware of their rights.  (See § II.B.1, supra).  Furthermore, Plaintiffs offer no evidence that LaserShip concealed drivers' right to overtime pay, or

> that a reasonably prudent potential plaintiff would not have known of his or her right to receive overtime pay after 40 hours.  Pursuit of that right is not dependent on the commencement or certification of a collective action, and a reasonably diligent person could have acted by pursuing an individual or collective action for relief.

Hintergerger, 2009 WL 3464134, at *15; accord Contrera, 278 F. Supp. 3d at 724; Knox, 282 F.

Supp. 3d at 658.

Given the absence of evidence of potential opt-in plaintiffs' reasonable diligence or of extraordinary circumstances, and the Court's authorization of distribution of the Revised Notice to the Collective, the Court finds that "determination as to the timeliness of each future plaintiff's action is better reserved for a future proceeding." Whitehorn, 767 F. Supp. 2d at 450. Accordingly, Plaintiffs' request for equitable tolling is DENIED WITHOUT PREJUDICE and "with the understanding that individual plaintiffs may seek such tolling upon demonstrating its applicability" to that plaintiff's circumstances. Id.; accord Johnson-Cradle, 2023 WL 3091675, at *9.

### IV. CONCLUSION

For the reasons set forth above, the Second Collective Motion is GRANTED IN PART and DENIED IN PART as follows:

(1) Pursuant to 29 U.S.C. § 216(b), the Court conditionally certifies this action as a collective action comprised of drivers who delivered packages out of LaserShip's Maspeth and Mineola warehouses from June 17, 2018 to the present (the "Collective").

(2) The parties shall promptly meet and confer regarding Court-ordered changes to the Proposed Notice and by **September 19, 2025**, submit the Revised Notice for the Court's review and approval.

(3) By **October 6, 2025**, the parties shall meet and confer regarding whether LaserShip possesses any additional Contact Information for the members of the Collective that

it has not already produced, and if so, a deadline for such production no later than **November 5, 2025**.

(4) Once approved by the Court, the Revised Notice and consent form shall be mailed, emailed, and/or sent by text message to all potential members of the Collective, who must opt-in to this action within 60 days of the date of distribution.

(5) Plaintiffs' request for equitable tolling is DENIED WITHOUT PREJUDICE to any individual plaintiff's ability to request tolling on a showing that tolling applies to that plaintiff's particular circumstances.

(6) LaserShip's request for argument (ECF No. 167) is DENIED AS MOOT.

The Clerk of the Court is respectfully directed to close ECF Nos. 147 and 167.

Dated:       New York, New York
             September 5, 2025

SO ORDERED.

_____
**SARAH L. CAVE**
**United States Magistrate Judge**